Case 3:15-cv-05565-MJP Document 1 Filed 08/10/15 Page 1 of 13



UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. MICHAEL GEORGE DAGGETT, <br><br> Plaintiff, <br><br> v. <br><br> REGIONAL TOXICOLOGY SERVICES, LLC, d/b/a STERLING REFERENCE LABORATORIES, and <br><br> ROCKY MOUNTAIN TOX, LLC, d/b/a CORDANT HEALTH SOLUTIONS, <br><br> Defendants. | NO. C15-5565RBL <br><br> COMPLAINT <br><br> [FILED UNDER SEAL] |

Michael George Daggett (the "Relator") brings this action in the name of the United States of America under the *qui tam* provisions of the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, against defendants Regional Toxicology Services, LLC d/b/a Sterling Reference Laboratories ("Sterling"), and Rocky Mountain Tox, LLC d/b/a Cordant Health Solutions ("Rocky Mountain") (jointly, the "Defendants"). Relator alleges as follows:

COMPLAINT- 1

Peterson | Wampold
Rosato | Luna | Knopp
1501 FOURTH AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101-1609
PHONE: (206) 624-6800
FAX: (206) 682-1415

## JURISDICTION AND VENUE

1. This Court has jurisdiction of this action under 31 U.S.C. § 3732(a) (the jurisdictional provisions of the False Claims Act), 28 U.S.C. § 1331 (federal question), and 28 U.S.C. §1345 (United States as a plaintiff).

2. Venue is proper in this District pursuant to 28 U.S.C. § 1391 and 31 U.S.C. § 3732(a), because a substantial part of the acts and false claims giving rise to this action occurred in this District.

3. As provided by 31 U.S.C. § 3730(b)(2), this action is being filed *in camera* and under seal, and has not been served on the Defendants. Relator has provided, or will shortly provide, to the United States Attorney General and to the United States Attorney for the Western District of Washington a copy of the Complaint and a disclosure statement, as required under the False Claims Act, 31 U.S.C. § 3730(b)(2).

## PARTIES

4. Relator is currently a resident of Richmond, Virginia. However, from March of 2013 until March of 2014, Relator lived and worked in Tacoma, Washington. During that time, he was Director of Operations for the Tacoma, Washington drug testing laboratory operated by Defendants under the name "Sterling Reference Laboratories."

5. The United States is also a party plaintiff by virtue of the False Claims Act, 31 U.S.C. § 3730(b). Relator brings this action in the name of the United States of America pursuant to the *qui tam* provisions of the False Claims Act.

6. Defendant Rocky Mountain Tox, LLC d/b/a Cordant Health Solutions ("Rocky Mountain") is a limited liability company organized under the laws of Colorado, with its principal place of business in Denver, Colorado.

Peterson | Wampold
Rosato | Luna | Knopp
1501 FOURTH AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101-1609
PHONE: (206) 624-6800
FAX: (206) 682-1415

7. Defendant Regional Toxicology Services, LLC d/b/a Sterling Reference Laboratories ("Sterling") is a limited liability company organized under the laws of Washington, with its principal place of business in Tacoma, Washington.

8. Rocky Mountain and Sterling are both part of a group of companies that currently is collectively managed and run under the "Cordant Health Solutions" brand. Other entities that are part of this brand include Sterling Healthcare Opco, LLC, Rocky Mountain Tox Holdings, Inc., Secon of New England, LLC, American Forensic Toxicology Services, LLC, and Technical Resources Managements, LLC. Since April of 2012, the companies that comprise the current "Cordant Health Solutions" brand have all been owned by a private equity firm, Waud Capital Partners. Those companies are collectively run and managed by a group of executives working out of a headquarters in Denver, Colorado. The companies began using "Cordant Health Solutions" as their brand in January of 2015; prior to that time, they operated under the brand "Sterling Healthcare Services."

## FACTS

9. Relator received his Bachelor of Science in Chemistry degree in 1981, and since that time has worked continuously in various positions in the medical laboratory testing industry.

10. In late 2012, Relator interviewed for a job with Sterling, and in January of 2013 was offered the position of Director of Operations for the Tacoma, Washington testing laboratory. He accepted that position, and began work on or about March 4, 2013.

11. The Tacoma, Washington testing laboratory was a large facility, comprising approximately 30,000 square feet, and employing approximately 100 people.

12. As Director of Operations, Relator was one of the highest-ranking employees at the Tacoma facility. He had responsibility for overseeing the day-to-day operations of the

COMPLAINT- 3

Peterson | Wampold
Rosato | Luna | Knopp
1501 FOURTH AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101-1609
PHONE: (206) 624-6800
FAX: (206) 682-1415

laboratory including, for example, budgeting, staffing and instrumentation. The laboratory also had a Scientific Director, who was responsible for scientific issues. But in most other respects, Relator ran the facility on a day-to-day basis.

13. Relator reported to the executive team located in Denver, Colorado. The members of that executive team had been chosen by Waud Capital Partners, which had purchased Sterling, and a number of other laboratories around the country, in 2012. The members of that executive team were employed by defendant Rocky Mountain.

14. As part of his job duties as Director of Operations, Relator would receive and review monthly financial statements showing the performance of the Tacoma laboratory. One of those financial statements was a Profit & Loss statement (a "P&L") that listed various categories of expenses incurred by or on behalf of the laboratory.

15. Reviewing and analyzing the monthly P&L was important to Relator's job because his performance was judged by the Denver-based management largely by reference to the profitability of the Tacoma laboratory. Accordingly, it was important to Relator to understand the various categories of expenses that the laboratory incurred, and to manage those expenses.

16. The first time Relator received a monthly P&L was in April of 2013. This P&L reflected the performance of the laboratory for March of 2013, which was the first month that Relator had been Director of Operations. Accordingly, Relator reviewed that P&L with great care.

17. The P&L had a category of expenses titled "Administrative Service Fees," and showed an expense of approximately $32,000 per month in that category.

COMPLAINT- 4

Peterson | Wampold
Rosato | Luna | Knopp
1501 FOURTH AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101-1609
PHONE: (206) 624-6800
FAX: (206) 682-1415

18. During his review of the P&L, Relator noticed the "Administrative Service Fees" line in the P&L. He did not know what "Administrative Service Fees" meant. Because it was a significant (and apparently recurring) expense, he decided to make inquiries to determine what it was so that he could determine whether it could be reduced or eliminated.

19. Relator first went to James Fricke, who was the Manager of Financial Planning and Analysis at the Tacoma laboratory, and had responsibility for the bookkeeping entries for the laboratory. In a face-to-face meeting in Fricke's office, Relator asked Fricke to explain the meaning of "Administrative Service Fees." Fricke responded that they were "kickbacks," using that exact word, and making "air quotes" with his fingers. Fricke explained that these "kickbacks" were paid each month to one of the laboratory's major customers, a company called Northwest Physicians Laboratories ("NPL") located in Bellevue, Washington.

20. The same day as Relator had the above-referenced conversation with Fricke, the Denver-based executive to whom Relator directly reported happened to be in the Tacoma laboratory. His name was Mark Scheman, and his title at the time was Vice President of Operations for Sterling Healthcare Services.

21. After the portion of his conversation with Fricke described above, Relator called Scheman over to join the conversation. Relator asked Fricke to repeat what he had told Relator, but this time to Scheman. Fricke did so, again describing the "Administrative Service Fees" as "kickbacks." Scheman responded by stating words to the effect of "don't call them kickbacks, they are administrative fees." When Relator pressed him to explain what the fees were for, Scheman said they were for "marketing," but would not provide any further explanation.

COMPLAINT- 5

Peterson | Wampold
Rosato | Luna | Knopp
1501 FOURTH AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101-1609
PHONE: (206) 624-6800
FAX: (206) 682-1415

22. Relator also inquired of Michelle Elliot, who was one of the original owners of the Tacoma laboratory, and Vice President of Human Resources. Elliott also referred to the fees as "marketing fees."

23. Not satisfied with the limited information he had received from Fricke, Scheman and Elliot, Relator made two further inquiries with other employees of the Defendants, in an attempt to better understand the nature of the "Administrative Service Fees" line in the P&L.

24. First, Relator contacted Evans Calas, who had ties to NPL. Relator asked Calas to provide a copy of the contract between Defendants and NPL, and Calas did provide that contract via email. Relator reviewed the contract, which called for payments to NPL of "marketing fees," but which did not describe what those "marketing fees" were for, or what Defendants were receiving in exchange for payment of those "marketing fees."

25. Second, after receiving the NPL contract, Relator forwarded it to Betsy Donat, who worked out of the Denver headquarters as the Chief Compliance Officer for Sterling Healthcare Services. Donat responded in a way that did not provide Relator with any additional information about the true nature of the fees.

26. At that point, Relator did not make further inquiries because he believed that he had done all that he could do within the company to raise the issue. He had brought the issue to two different Denver-based executives (Scheman and Donat), and both had informed him that the "fees" were acceptable, albeit without any explanation for what those fees were for. As a result, Relator understood that he should not press the issue further, and that whatever the true nature of the "fees," it was not something he would be told or expected to manage.

27. For the next few months, each time he would receive the monthly P&L, Relator would see the "Administrative Services Fee" line item in approximately the same amount.

COMPLAINT- 6

Peterson | Wampold
Rosato | Luna | Knopp
1501 FOURTH AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101-1609
PHONE: (206) 624-6800
FAX: (206) 682-1415

28. Then, in August of 2013, the "Administrative Services Fee" line item increased to approximately $90,000 per month.

29. Upon seeing the increase in that line item, Relator asked Fricke for an explanation. Fricke told Relator that the increase was due to the fact that the "kickbacks" were now being paid to both NPL and a new client named Genesis, with facilities located in Tennessee.

30. Relator subsequently was sent a PowerPoint slide presentation by Scheman, which was to be given by Sue Sommer, the President of Sterling Healthcare Services, to the Board of Directors of the Sterling group of companies. That PowerPoint presentation also made reference to an "administrative services fee" being paid to a "new client" named Genesis.

31. Defendants billed Medicare and Medicaid for a significant portion of the tests that were conducted at the Tacoma laboratory for NPL and Genesis.

32. The Tacoma laboratory was and is a "toxicology" laboratory, meaning that it primarily tests urine, oral fluid and blood samples for the presence of drugs, both prescribed and illegal. The two main lines of business are: (1) testing for illegal drugs on behalf of employers doing drug screening, or on behalf of participants in the criminal justice system; and (2) testing prescribed by physicians to monitor patients' use of medications, primarily medications used for pain management or addiction treatment.

33. The testing done by the Tacoma laboratory on behalf of both NPL and Genesis fell into the second category. NPL is a testing laboratory that was set up and owned by a group of physicians in the Bellevue, Washington area who specialized in pain management. Although they conducted some pain management-related testing themselves at their own facility, they were unable to conduct the full range of testing that Defendants offered; accordingly, they sent many

COMPLAINT- 7

Peterson | Wampold
Rosato | Luna | Knopp
1501 FOURTH AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101-1609
PHONE: (206) 624-6800
FAX: (206) 682-1415

of their samples to the Tacoma laboratory for tests they could not conduct themselves. Genesis is believed to be a physician group or other healthcare company that, at least in part, offered pain management services. Accordingly, the samples that the Tacoma laboratory tested for NPL and Genesis were primarily for patients who were being treated for pain management.

34.     These types of tests are covered by Medicare and Medicaid. Medicare provides coverage to patients over the age of 65. Medicaid provides coverage to low income patients, disabled patients, and certain other categories of patients. Many, if not most, of the tests conducted by the Tacoma laboratory on behalf of NPL and Genesis were covered either by Medicare or Medicaid, and were billed by Defendants to those programs.

35.     Relator was also told by two of Defendants' employees that the testing done on behalf of NPL and Genesis was being billed to Medicare and/or Medicaid. Those two employees were James Fricke (discussed above) and Michelle Elliot, who was a Vice President for Human Relations.

36.     Under the federal False Claims Act ("FCA"), a person is liable to the Government for "(A) knowingly present[ing], or caus[ing] to be presented, a false or fraudulent claim for payment or approval; (B) knowingly mak[ing], us[ing], or caus[ing] to be made or used a false record or statement material to a false or fraudulent claim; (C) conspir[ing] to commit a violation subparagraph (A), (B), (D), (E), (F), or (G) . . . [or] (G) knowingly mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceal[ing] or knowingly and improperly avoid[ing] or decreas[ing] an obligation to pay or transmit money or property to the Government[.]" 31 U.S.C. § 3729(a)(1).

Peterson | Wampold
Rosato | Luna | Knopp
1501 FOURTH AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101-1609
PHONE: (206) 624-6800
FAX: (206) 682-1415

37. Compliance with the federal Anti-Kickback statute ("AKS") and Stark law is a condition of receiving payment under federally-funded healthcare programs, including Medicare, Medicaid, and Tricare.

38. Because compliance with the AKS and Stark law is a condition of payment for Medicare and Medicaid, claims submitted for services rendered in violation of these statutes are "false or fraudulent" for purposes of the FCA.

39. Furthermore, legislation passed in the Fraud Enforcement Recovery Act of 2009 and the Patient Protection and Affordable Care Act established that the failure to return an overpayment by Medicare or Medicaid stemming from a claim submitted in violation of the Stark law constitutes a violation of § 3729(a)(1)(G).

40. In addition, healthcare providers must sign a standard Provider Agreement to receive reimbursement from Medicare. The agreement states: "I agree to abide by the Medicare laws, regulations and program instructions that apply to me. . . . I understand that payment of a claim by Medicare is conditioned upon the claim and underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the [provider's] compliance with all applicable conditions of participation in Medicare." *See* CMS Forms 855S, 855A, and 855I.

41. The AKS provides that a person that engages in the following misconduct shall be guilty of a felony:

> (1) whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind—
>
> (A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

COMPLAINT- 9

Peterson | Wampold
Rosato | Luna | Knopp
1501 FOURTH AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101-1609
PHONE: (206) 624-6800
FAX: (206) 682-1415

      (B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program . . . .

  (2) whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly, or covertly, in cash or in kind to any person to induce such person—

      (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

      (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program.

42 U.S.C. § 1320a-7b(b)(1)-(2).

    42. Under the Stark law, if a physician has a financial relationship with an entity, then:

      (A) the physician may not make a referral to the entity for the furnishing of designated health services for which payment otherwise may be made under this subchapter, and

      (B) the entity may not present or cause to be presented a claim under this subchapter or bill to any individual, third party payor, or other entity for designated health services furnished pursuant to a referral prohibited under subparagraph (A).

42 U.S.C. § 1395nn(a)(1).

    43. The "Administrative Services Fees" paid by Defendants to NPL and Genesis violated the AKS and Stark law because they were paid to induce NPL and Genesis to send their samples to Defendants' Tacoma laboratory for testing. Defendants knew, or reasonably should have known, that these arrangements were unlawful. Thus, Defendants violated the FCA by knowingly submitting or knowingly causing others to submit claims to Medicare and Medicaid in violation of the AKS and Stark law.

COMPLAINT- 10

Peterson | Wampold
Rosato | Luna | Knopp
1501 FOURTH AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101-1609
PHONE: (206) 624-6800
FAX: (206) 682-1415

## CLAIMS FOR RELIEF

### Count I
### Violation Of 31 U.S.C. § 3729(a)(1)(A)

44. Paragraphs 1 through 42 are incorporated herein by reference.

45. By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval to officers or employees of the United States Government.

46. As a result of these false or fraudulent claims, the United States Government suffered damages.

### Count II
### Violation Of 31 U.S.C. § 3729(a)(1)(B)

47. Paragraphs 1 through 46 are incorporated herein by reference.

48. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim for payment or approval to officers or employees of the United States Government.

49. As a result of these false records or statements, the United States Government suffered damages.

### Count III
### Violation Of 31 U.S.C. § 3729(a)(1)(C)

50. Paragraphs 1 through 49 are incorporated herein by reference.

51. By virtue of the acts described above, Defendants conspired with NPL and Genesis to commit violations of 31 U.S.C. §§ 3729(a)(1)(A)-(B).

52. As a result of this conspiracy, the United States Government suffered damages.

### Count IV
### Violation of 31 U.S.C. § 3729(a)(1)(G)

53. Paragraphs 1 through 52 are incorporated herein by reference.

COMPLAINT- 11

Peterson | Wampold
Rosato | Luna | Knopp
1501 FOURTH AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101-1609
PHONE: (206) 624-6800
FAX: (206) 682-1415

54. By virtue of the acts described above, Defendants knowingly and improperly avoided their obligation to return money paid by Medicare and Medicaid for claims submitted in violation of the Stark law.

55. As a result of avoiding its obligation to return money paid to Medicare and Medicaid for claims submitted in violation of the Stark law, the United States Government suffered damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

a. A permanent injunction requiring Defendants to cease and desist from violating the False Claims Act;

b. Judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained as a result of Defendants' unlawful conduct;

c. Civil monetary penalties for each false and fraudulent claim submitted to the United States by Defendants;

d. An award to Relator pursuant to 31 U.S.C. § 3730(d);

e. An award of reasonable attorneys' fees, costs, and expenses; and

f. Such other and further relief the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38, Plaintiff demands trial by jury of all issues so triable.

COMPLAINT- 12

Peterson | Wampold
Rosato | Luna | Knopp
1501 FOURTH AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101-1609
PHONE: (206) 624-6800
FAX: (206) 682-1415

DATED this 10th day of August, 2015.

        **PETERSON | WAMPOLD**
        **ROSATO | LUNA | KNOPP**

        */s/Felix Gavi Luna*
        Felix Gavi Luna, WSBA No. 27087
        Leonard J. Feldman, WSBA No. 20961
        1501 4th Avenue, Suite 2800
        Seattle, WA 98101
        Ph. (206) 624-6800
        luna@pwrlk.com
        feldman@pwrlk.com

        and

        **TYCKO & ZAVAREEI LLP**

        */s/Jonathan K. Tycko*
        Jonathan K. Tycko
        TYCKO & ZAVAREEI LLP
        2000 L Street, N.W., Suite 808
        Washington, D.C. 20036
        Tel: (202) 973-0900
        jtycko@tzlegal.com

        Attorneys for *Qui Tam* Plaintiff Michael George Daggett

COMPLAINT- 13

Peterson | Wampold
Rosato | Luna | Knopp
1501 FOURTH AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101-1609
PHONE: (206) 624-6800
FAX: (206) 682-1415